**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**MOZELLA PRICE, Individually and as**
**Administratrix of the ESTATE OF TRILLUS**
**SMITH, Deceased and its Beneficiaries;** *et al.*                    **PLAINTIFFS**

      **v.**                    **CASE NO. 4:19-cv- 200 JM**

**CHARLES "DOC" HOLLADAY, Individually and**
**In his Official Capacity as the Sheriff of Pulaski**
**County, Arkansas;** *et al.*                    **DEFENDANTS**

<u>**ORDER**</u>

      This case arises out of the death of pre-trial detainee Trillus Smith following twelve days in the custody of the Pulaski County Regional Detention Facility (PCRDF).  Pending are three dispositive motions filed by the remaining defendants in this case:  a motion to dismiss or alternative motion for judgment on the pleadings filed by the nurses employed by Turn Key Health (Linda McCraw, Quelinda Tillman, Shamika Humphrey, Shawn Adams, and Haley Hogan—the "Nurse Defendants) (Doc. No. 36); a motion for summary judgment filed by Charles "Doc" Holladay, Pulaski County, Arkansas, Matthew Briggs, Toni Rose, Ronald Rough, Vanorris Sims, Karen Knudsen, James Church, and V. Clark (the "County Defendants") (Doc. No. 41; and a motion for summary judgment filed by Turn Key Health Clinics, LLC ("Turn Key") (Doc. No. 38).  For the reasons stated below, each of these motions is granted.

<u>Undisputed Facts</u>

      The following undisputed facts are compiled from the County Defendants' Statement of Facts (Doc. No. 42) and Plaintiffs' response thereto (Doc. No. 48), Turn Key's Statement of

Undisputed Material Facts (Doc. No. 39),[1] and the exhibits to each. The Court has read through the 460 pages of records attached to the County Defendants' motion for summary judgment found at Document No. 42-2 and brought forth facts contained therein in many instances where the facts were not brought to the Court's attention in their statements of facts or in their briefs.

On February 1, 2017 at 11:56 p.m., Trillus Smith was admitted via ambulance to the emergency department of Baptist Health Medical Center (BHMC) for anxiety issues.  She was 22 years old.  She stated that her anxiety attack was triggered by her brother and sister fighting.  Smith reported that she suffered from asthma, depression, and dysfunctional grieving.  Her blood pressure at the time of admittance was 114/80.  Her physical exam showed that she was well-developed and well-nourished 22 year-old black female, oriented to person, place, and time.  She was seen by Dr. Clinton Evans who noted the she had no respiratory distress, was alert and oriented, and her speech and behavior were normal.  Smith agreed to a referral for an outpatient therapist and was calm when she left the emergency department sometime after 12:38 a.m. on February 2nd.

Smith was readmitted to the emergency department at BHMC a couple of hours later, at approximately 2:30 a.m. on February 2nd.  She saw a different nurse and doctor this time.  Nurse Mary Harper, RN, noted that Smith complained of lower back pain as well as nausea and vomiting.  Smith's behavior was odd:  she asked for and was provided a "washcloth, soap and clean undergarments" but rather than stay in her room, she stated that "wants to wash herself out in [the] hallway with gloves."  When Nurse Harper tried to get Smith back in her room, she

---

[1] Plaintiffs filed their own "Statement of Undisputed Material Facts in Support of Their Response to Turn Key's Motion for Summary Judgment" (Doc. No. 46) in which they asserted, without citation to any evidence of record, that the allegations of their complaint were undisputed; and they adopted by reference the exhibits attached to the County Defendants' statement of facts (Doc. 42-1, 2, 3, and 4).

started yelling and making "inappropriate statements" to the security officer who was trying to get Smith to stay in her room.  Smith then got irate at the security officer and at an off-duty deputy from the Pulaski County Sheriff's Office, Deputy Calvin; she yelled "rape" then stabbed the security officer with a pen in the side of his neck.  At that point she was handcuffed and taken to the Pulaski County Regional Detention Facility (PCRDF) by Deputy Calvin.

During her transport to PCRDF, she repeatedly kicked the rear windshield causing Deputy Calvin to open the rear door of the patrol car and try to gain control of her legs.  Smith bit his wrist, and he sprayed her with oleoresin capsicum spray ("OC spray," also known as pepper spray).  He then took her on to PCRDF where she was booked for 2nd Degree Battery, Aggravated Assault, and Criminal Mischief.

PCRDF contracts with Turn Key to provide medical care to inmates at the facility.  Pulaski County Sheriff's Office (PCSO) Branch Directive D10-003 sets forth the policy that "[d]ecisions and actions regarding the health care services provided to inmates are the sole responsibility of qualified health care personnel and are not compromised for security reasons . . . Only qualified health care personnel . . .  will be permitted by law to evaluate and care for patients."  (Doc. No. 42-3, p. 18).

On February 3, 2017, Nurse Moore, an employee of Turn Key, completed an intake health screening of Smith.  No vital records were recorded at this point.[2]  The intake records (Doc. No. 39-1) reflect the following:  Smith was released from the hospital the day before; she listed citalopram as a current medication; Smith has asthma and last used her inhaler at BHMC;

---

[2] Turn Key states that Nurse Moore assessed Smith's vital records at 2:11 on February 3, 2017 (Doc. No. 39, p. 1), but examination of the supporting records indicates a body temperature reading of 000.00, a pulse rate of 000.00 BMP, blood pressure of 000/00, and oxygen saturation at 0000. (Doc. No. 39-1, pg. 23-24).

and, she suffers from panic attacks.  Nurse Moore noted that Smith would "stare off on occasion

and do a[n] outline of cell door."  Smith reported that she had been incarcerated previously and

had been involved in a violent offense while in custody.  In response to the mental health

screening questions, Smith responded yes when asked if she felt that there was nothing to look

forward to in her future and also when asked whether she was extremely depressed before her

arrest.  According to Nurse Moore's notes, Smith "said she was alone and taken," but she

couldn't explain what she meant.  Because of her yes answers, Smith was immediately placed on

suicide watch in accordance with the facility's policies.

During the intake evaluation, Smith also reported that she had attempted to harm herself

sometime in the past and she had been treated at two or more hospitals for mental health issues.

She answered yes to the question of whether she has "nightmares, flashbacks, or repeated

thoughts or feelings related to PTSD or something terrible from her past"; yes to the question of

whether she was "worried that someone might hurt or kill" her; and yes when asked whether she

had been "a victim of physical, emotional or sexual abuse in the past 5 days."   When asked

whether she had ever been told that she had difficulty learning, Smith said she "was a little

slow."  Nurse Moore noted that Smith "just had the appearance of someone suffering from

mental disorders."  As at BHMC, Smith stated that she would like a referral to receive mental

health treatment.

The PCRDF records and the medical records of Turn Key from February 4, 2017 until the

date of Smith's death at PCRDF eleven days later are disturbing. (Doc. No. 42-2).  On February

4, 2017, Nurse Nix was making her mental health segregation rounds and saw that Smith was

standing naked on the stool in her cell.  Smith stated that "some guys were trying to kill me," that

she knows the guys and has filed a report with the police.  At some point in the encounter Smith

was trying to read the notes on her chart being held by Nurse Nix and yelled that the notes were

wrong.  Smith also "report[ed] that her brother, who is on the unit, raped her" and was adamant

that he had been on all-female unit.  Nurse Nix checked the boxes for psychomotor agitation and

intermittent eye contact and stated that Smith was delusional and confused.  Confusingly, Nurse

Nix also checked the box indicating that Smith was appropriately attired and checked the box

"no" in response to whether Smith was "orientated to person, place, time, and situation" but in

the description typed that "Inmate is oriented to person and place."[3] (Doc. No. 39-1).

On February 5, 2017, Smith was OC sprayed for the second time since she'd been taken

into custody (the first time being while in the patrol car on the way to PCRDF).  The incident

occurred when Deputy Church and Deputy Moton were cleaning trash out of Smith's cell.  She

refused orders to stay back and to stay in her cell and was eventually OC sprayed for refusing to

return to her cell.  Nurse Bahan used eyewash to decontaminate Smith's eyes.  Her blood

pressure was recorded at 131/87.  Several deputies were involved in getting Smith back in her

cell after she was seen by medical and cleared to remain in her cell, as she continued to resist.

(Doc. No. 42-2, p. 442).

Smith was again OC sprayed on February 7, 2017.  According to PCDF incident reports

(Doc. Nos. 42-2, pp. 382-398), Sergeants Hoof, Luckadue, and Sanders were attempting to assist

with the cleaning of Smith's cell and have her hand, which had blood on it, examined by medical

personnel.  Smith was noncooperative and became combative, wildly kicking her legs and

attempting to bite Sergeant Sanders.  Sergeant Hoof administered one burst of OC spray; he

reported that both before and after she was sprayed, Smith was talking about "being burned up at

---

[3] Turn Key's summary of Nix's encounter with Smith is simply that "Nurse Nix saw
and assessed decedent.  Decedent was oriented to person and place."  (Doc. No. 39, p.
1).

Baptist Hospital" and "being burned up in her cell."  Sergeant Luckadue reported that while medical was attempting to assess her, Smith was "talking crazy and spitting on herself." Medical flushed her eyes, and she and was cleared to remain on the unit.

On February 8, 2017, Nurse Bahan treated Smith for a fourth OC-spray incident.  This time she was sprayed for refusing to leave her cell to go take a shower for the fourth day. Sergeant Knudsen authorized the use of the OC spray, and Deputy Nichols administered a burst to her face.  Then four deputies carried Smith "to the lower back sub day" (Doc. No. 42-2, p. 372) since she refused to walk.  Turn Key records indicate that Smith was sitting on the floor "rocking and talking to herself" when Nurse Bahan arrived, and that she was unable to assess Smith's blood pressure at that time because of her behavior.  Nurse Bahan decontaminated Smith and cleared her to return to her cell.  The deputies then laid her on the shower floor, sprayed her with soap, and turned on the shower to rinse her off.  She was carried back to her cell.  (Doc. No. 42-2, pp. 368-375).

Dr. Thompson observed Smith through the cell door on February 9, 2017, but he was advised that it was dangerous to try to open the door due to her violent behavior. The next day Dr. Thompson again saw Smith through her cell door; he offered her water but she did not drink it.  Dr. Thompson reported to a deputy that she yelled through the encounter on the 10th.  (Doc. No. 42-6, p. 4).

Early in the morning of February 11, 2017, Nurse Warren checked on Smith and commented:  "Inmate laying on floor with green suicide outfit over her body; does not follow simple commands; fine tremors; skin warm/extremely dry; unable to have [inmate] drink/lets fluid run out of mouth;  . . . verbal but not able to understand words I'm saying; Deputy stated 'I do not think she is eating,' will monitor; appears to be exhaustion from 1 week of constant

motion and yelling."   At 6:45 p.m., Deputy V. Clark contacted Sergeant McKanna and reported that Smith had not eaten or drunk anything during Clark's shift for the last two days. (Doc. No. 42-4, p. 440).  Clark attempted to give Smith some water but that she was extremely weak and could not sit up on her own.   Sergeants Scott, Waters, and McKanna came to Smith's cell and medical was notified.  At 9:21 p.m., Nurse Tillman noted Smith's blood pressure was 98/70 and that her mucous membranes were dry.  She "notified MD of situation," and Smith was given 400 ml of IV fluids bolus.  After that Nurse Tillman was able to get her to drink two cups of water on her own and was able to stand.   She declared her stable at that time.

On February 12, 2017, a nurse was called to help deputies, including Knudsen, give Smith a shower.  Lieutenant Sims requested the medical assistance because Smith he reported that Smith had diminished capacity due to her refusal to eat or drink for the past two days.  She was observed to be very weak, she was refusing fluids, her blood pressure was 98/40, and Nurse Humphrey was unable to feel a palpable pulse or get an oxygen reading. After the shower she was checked and cleared by Turn Key employees to remain in the unit.

On February 13, 2017 at approximately 9:30 a.m., Sergeant Sanders and Deputy Robinson entered Smith's cell and called for a medical assessment of Smith.  She was lying on her back and they deputies had offered her some water.  Deputy Robinson noticed that her "breathing appeared to be very labored." Sergeant Sanders noted that after Smith took a couple of sips "she then bit a piece of the cup and her head fell back, he eyes became set, and she began gasping for air; her breathing became short and with long pauses; she then stopped breathing." Deputy Robinson called a Code Red (medical emergency) and Nurse Adams, Nurse Humphrey, Doctor Thompson, EMT Grimes responded.  Lieutenant Routh responded for additional security. Nurse Nix reported the following: Smith was lying on the floor naked, with her head towards the

7

door; her speech was not coherent; she was not eating or drinking; she was able to drink a half of

cup of water but was "unable to consume" more.  Nurse Nix further noted that Smith "did not

attempt to sit up and appears exhausted and dehydrated," alert but not oriented, "primarily

listless" with a flat affect.  The medical records also reflect that Smith had been "combative,

yelling, cursing, spitting and fighting anyone that came near her."  Her current symptom severity

was marked "severe."  At that time, Dr. Thompson ordered 50 mg of Thorazine twice a day

(until a prescription of Haldol could come from the pharmacy).   Nurse Adams administered the

shot of Thorazine at 9:55 a.m., and medical personnel assessed Smith and cleared her to remain

on the unit.

At 11:15 a.m., deputies again called medical personnel to Smith's cell.  Dr. Thompson's

notes from the incident are minimal, consisting of the following comments: "Please see extensive

nursing documentation surround the code red this morning.  Briefly, the patient received 50 mg

of chlorpromazine[4] (my order) IM this morning. She was subsequently found to be obtunded[5] by

the deputies who called a code red.  Medical staff arrived and she was profoundly hypotensive

without palpable distal pulses.  She was given 2.5 liters of fluid intravenously and returned to her

previous mental status.  We have added chlorpromazine to her allergy list."

At 1:16 p.m., Nurse Mannis checked on Smith and found her lying on the floor by her

bunk, reportedly responsive to verbal stimuli.   Nurse Mannis noted Smith's blood pressure to be

90/62 and made these comments: "Capillary refill initially greater than 6 seconds. Unable to

---

[4] Marketed as Thorazine.
[5] "Obtundation is a state similar to lethargy in which the patient has a lessened interest
in the environment, slowed responses to stimulation, and tends to sleep more than
normal with drowsiness in between sleep states."
https://www.ncbi.nlm.nih.gov/books/NBK380/

obtain VS, O2 started 8L via mask. MD notified.  Stat orders for IV and fluids given bolus, 20 gauge catheter to left AC x 1 attempt. D51/2 started bolus X 1 Liter. 1 ½ Liter of NS given bolus following D51/2. O2 turned down to 3L via NC. O2 sat 98%.  Capillary refill less than 3 seconds after bolus.  VS WNL. Stable condition at this time."  Smith was cleared to remain in her cell.

At 6:42 p.m., still on the February 13th, Nurse Humphrey saw and assessed Smith as follows: "Inmate incoherent, unable to sit up without total assistance. Observed Deputies attempting to give inmate water.  Inmate continues to refuse."  A charge nurse was notified.  At that time Smith's blood pressure was 108/40.  Deputy Watkins, Captain Rose, Sergeant Knudsen were in the cell as Nurse Haley assessed Smith at 8:36 p.m. and noted: "Inmate lethargic, displays psychosis, naked, lying on cold concrete floor, does not respond to verbal stimuli,  not eating or drinking, lets food and water slide out of her mouth, words are nonsensical, not combative, eyes rolling in head."  Her lips were dry, her skin cold to touch, and she was incoherent.  Smith's blood pressure was 95/63 at that time.  After Smith's condition was reported to Dr. Thompson, he ordered a 5 mg injection of Haldol.   The medical personnel then cleared her to remain in the cell.

The next day, February 14, 2017, Nurse Dowdy saw Smith while she was making her segregation rounds for inmates on suicide watch.  She noted: "Inmate reportedly decompensated over the weekend into Monday and is no longer eating or drinking per nursing reports.  At this time, Inmate was lying on the floor on her suicide blanket.  When staff knocked on the door, Inmate turned to look at worker but would not speak or interact."  Due to Smith's "current status and decline in functioning," an appointment was made for February 16, 2017 to file a petition for civil commitment to the Arkansas State Hospital."  Nurse Humphrey recorded Smith's blood pressure as 82/56 at 8:51 a.m. on the 14th.  There is no indication that her condition was reported

to Dr. Thompson.

Smith's medical records also reflect that Smith had labs drawn at 9:00 a.m. on the February 14th and processed by Quest Diagnostics. (Doc. No. 39-1, p. 11).  Many of Smith's results were out of range of normal.  Her glucose was low while her urea nitrogen, and creatinine levels were high.  The report noted "abnormal results—chronic kidney disease."  Smith's sodium and carbon dioxide levels were listed as "critical values"—it is not clear form the records if these values were called into the medical personnel.[6]   Her white blood cell count was also high, over twice the range of the reference range.

Because she was on suicide watch, PCRDF policies required her to be checked on every fifteen minutes.  PCRDF jail log entries reflect that on the morning of February 15, 2017, jail staff checked on Smith approximately every fifteen minutes from 12:45 a.m., through 4:31 a.m., with the exclusion of a check that should have occurred at approximately 4:15 a.m.[7] (Doc. No. 42-2, pp. 90-95).  The County Defendants included as a statement of fact that these records reflect that staff checked on Smith and noted that Smith "appeared awake and okay" at these checks. (Doc. No. 42, p. 10); to the Court, the records appear to reflect that throughout the night she appeared either "asleep and okay" or "awake and okay" and was found either on her bunk or on the floor, sometimes for the same time entry.  Because these records appear to conflict with themselves, the jail log entries will not be treated as uncontested facts.

Smith was found unresponsive in her cell in at 4:45 a.m. on February 15, 2017 by Deputies Moton and Thomas.  Moton called a Code Red and began administering chest

---

[6] The report states of these two results: "Critical value.  Results called to and read back by: [with no name provided]."
[7] Sergeant Mike Blane conducted a video review to confirm those check times and concluded that the check reported to have occurred at 4:17 a.m. was not, in fact, done.

compressions.  EMT Sylvia Scott and Nurses Warren, Stowe, and Thompson responded.  The

Little Rock Fire Department arrived at 4:54 and took over chest compressions.  Metropolitan

Emergency Medical Services (MEMS) arrived at 5:04 and Smith was pronounced dead.

Ryan Geary of the PCSO interviewed the PCRDF and Turn Key staff the morning Smith

died. (Doc. No. 42-2, p. 31).   Nurse Warren told him that she did not believe Smith had any

medical conditions" and that "all of Smith's problems were emotional and mental" and that she

had been "psychotic" the whole time she had been at the facility.  Because of her mental state,

the facility "never got to do the intake process with Smith" and they were going to "try and get

the paperwork complete" if Smith had ever calmed down.[8] *Id.*

Nurse Stowe told Geary that she had seen Smith the day before, on the 14th, and seen the

deputies try to give Smith water but "she knocked it over and rolled over on the floor."  (Doc.

No. 42-2, p. 32).   Nurse Thompson said she had not had any interaction with Smith prior to the

code red being called but had heard that Smith was "not eating and was not wanting to drink."

(Doc. No. 42-2, p. 33).

The two deputies who had been on the night shift and conducting the suicide watch on

Smith were also interviewed.  Deputy Thomas told Geary that she saw Smith moving her head

left to right at different times through the night, always on the floor; during the 3:00 a.m. check

"she only saw inmate Smith moving her eyes;" Geary noted that Thomas began "rolling her eyes

up and around as she described Inmate Smith's eye movement."  (Doc. No. 42-2, p. 34).   Deputy

Moton told Geary that when she and Deputy Thomas entered Smith's cell to deliver her breakfast

tray, Smith "was laying on the floor and was looking in a gaze, like she was on medication and

---

[8] This is not discussed in the briefs by either party, and it is unclear what paperwork was not
completed or what it might have revealed.

that she "had been that way through the shift." (Doc. No. 42-2, p. 35). She also reported that

Smith was cold to the touch. (Doc. No. 42-2, p. 68). Moton also told Geary she could not recall

the exact times she had checked on Smith and that she had had to go give breaks to other

deputies in other units during her shift.

EMT Scott responded to the Code Red and told Geary she was in Smith's cell within a

minute. She reported that "during her contact with the inmate she noticed she was cold to the

touch." (Doc. No. 42-2, p. 36).

After the autopsy was performed on Smith but before the report was issued, Lieutenant

Robert Garrett of the PCSO contacted Dr. Cunningham from the Medical Examiner's Office.

After Lt. Garrett forwarded Smith's February 14, 2017 lab results to Dr. Cunningham, he reports

that Dr. Cunningham stated "it appears she was definitely dehydrated. It also [illegible] her

having low blood sugar (hypoglycemic). Both could be from the fact that she was not eating or

drinking . . . . both dehydration and low blood sugar, that could be a factor as to what happened

to Smith." (Doc. No. 42-2, p. 38). But, Dr. Cunningham stated that could not be confirmed at

that time, and she would have to compare her toxicology results from her examination once they

were complete. *Id.* The autopsy report ultimately issued on March 16, 2017 (Doc. No. 42-2, pp.

11-19), listed the cause of death as acute pneumonia and dehydration complicating bronchial

asthma. A contributory cause of her death was "unspecified psychosis." There were abrasions

and contusions observed on Smith's body consistent with the history reported by PCRDF, but

these were ruled not to have caused or contributed to Smith's death. The coroner ruled her death

a natural death.

Mozella Price, mother of the deceased, is the administratrix of her daughter's estate and

brings this action in her representative capacity and in her individual capacity. Trillus Smith's

three siblings, Tryten Tillman, Tranetta Lemay, and Treylon Lemay (a minor), are also joined as

plaintiffs.  The complaint asserts claims for medical negligence, survival, and wrongful death

under Arkansas statutes; in addition, Plaintiffs seek relief under "any other applicable laws for

medical negligence, ordinary negligence, neglect of an endangered or impaired adult, breach of

fiduciary duty, wrongful death, 42 U. S. C. 1983 and applicable Arkansas State laws."

The Nurse Defendants' Motion to Dismiss
or Alternative Motion for Judgment on the Pleadings

The Nurse Defendants assert that all claims against them should be dismissed pursuant to

Rule 12(b)(5) of the Federal Rules of Civil Procedure for failure to obtain service on them and

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

Alternatively, they seek judgment on the pleadings pursuant to Rule 12(b)(c) of the Federal

Rules of Civil Procedure.

A summons must be served with a copy of the complaint, and the plaintiff is responsible

for having the summons and complaint served within 90 days after the complaint is filed.  Fed.

R. Civ. P. 4(c) and (m).   Service on an individual may be obtained by following state law for

serving a summons or by doing "any of the following: (A) delivering a copy of the summons and

of the complaint to the individual personally; (B) leaving a copy of each at the individual's

dwelling or usual place of abode with someone of suitable age and discretion who resides there;

or (C) delivering a copy of each to an agent authorized by appointment or by law to receive

service of process. Fed. R. Civ. P. 4(e).   "If a defendant is not served within 90 days after the

complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss

the action without prejudice against that defendant or order that service be made within a

specified time. But if the plaintiff shows good cause for the failure, the court must extend the

13

time for service for an appropriate period." Fed. R. Civ. P. 4(m).[9]

Plaintiffs' filed their complaint on February 1, 2019 giving them until May 2, 2019 to

effect service on the Nurse Defendants. The record does not indicate that there has been any

attempt to obtain service on any of the Nurse Defendants.

In response to the motion to dismiss (Doc. No. 49),[10] Plaintiffs state that the Nurse

Defendants were not served "for a number of reasons," none of which are given. Instead,

Plaintiffs argue that these defendants have "voluntarily entered into and participated in this

lawsuit" because "Plaintiffs believe" they want to clear their name. Plaintiffs take the position

that the Nurse Defendants have entered the lawsuit for some business reasons of their own and

urges the Court to not "thwart their reasons." Plaintiffs cite to "vital information" contained in

the record that they argue demonstrates why the Nurse Defendants should not be dismissed.

Notably absent from Plaintiffs' response is any explanation for their complete failure to

obtain service on these Defendants. The record is devoid of any attempts at service or any

request for an extension of time in which to obtain service. Furthermore, while Plaintiffs

response states that "at the time of the filing of the Complaint" Plaintiffs were "initially intent

[on] pursing individually the nurses named as these nurses played a part, however limited, in the

death of Trillus Smith" (Doc. No. 53, p. 2), it appears that Plaintiffs abandoned that intention

sometime after filing the complaint. The Nurse Defendants' only appearance in this case is to

---

[9] In their brief, Defendants give the Plaintiffs the benefit of Arkansas's 120 days for
obtaining service rather than the 90 days now allotted by Fed. R. Civ. P (4)(m). While
the federal 90-day rule is controlling—*see Graen v. FCA US, LLC*, No. 5:15-CV-
05289, 2016 WL 3566686, at *1 (W.D. Ark. June 24, 2016)—the additional 30 days
would not change the analysis in this case.

[10] Plaintiffs actually filed three documents in response to the motion to dismiss:  a
response (Doc. No. 49) filed on June 8, 2020; a statement of undisputed material facts
in support of their response (Doc. No. 52) filed on June 11, 2020; and a brief in
opposition (Doc. No. 53) filed on June 17, 2020.

seek dismissal; they have not sought any other relief from the Court.

A federal court lacks personal jurisdiction over a defendant if service of process is insufficient. *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104, (1987). The Nurse Defendants' motion to dismiss for failure to obtain service is granted. The Court will not consider the remaining grounds for dismissal.

### Standard of Review for Motions for Summary Judgment

Summary judgment is appropriate only when the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Celotex Corp.,* at 327.

### The County Defendants' Motion for Summary Judgment

The Court grants the County Defendant's motion to dismiss the individual claims of Mozella Price, Tryten Tillman, Trannetta Lemay, and Treylon Leman as they are not proper parties to this wrongful death and survival action. Mozella Price as the appointed personal representative of the estate of her daughter is the only proper plaintiff. Ark. Code Ann. § 16-62-

102(b); Ark. Code Ann. § 16-62-101(a)(1).

Next Defendants "Doc" Holladay and Major Matthew Briggs seek summary judgment on the § 1983 individual capacity claims against them.  Holladay was the sheriff of Pulaski County at the time of Smith's detention and death.[11]  Briggs was the Major in line of command with responsibility for operating of the PCRDF at the time of Smith's incarceration.[12]

"[A] supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996).  Plaintiff does not allege that Holladay or Briggs directly participated in any of the events involving Smith during her incarceration.[13]  Rather, Plaintiff asserts that liability against these two defendants is based on "Holladay and Briggs' failure to take and carry [out] those mandates required by long-standing laws and case regarding the treatment of mentally ill individuals who are incarcerated in jail situations." (Doc. No. 47, p. 2).

Defendants Holladay and Briggs introduced evidence in support of their motion for summary judgment regarding the chain of command through which officers are supervised and the policies and procedures in place to ensure supervisory review of actions taken at every level of command. (Affidavit of Lesa Warner, Docs. No. 42-1 through -3).  Defendants submitted evidence that the deputies are trained in basic medical procedures "at least every two years" and that such training includes "[r]ecognizing the need for emergency care in life-threatening situations" and "[r]ecognizing mental or disabling conditions," and "[m]ethods of obtaining medical assistance and referring of inmates to health professionals."  (Doc. No. 42-3, p. 120-

---

[11] His term ended on December 31, 2018.

[12] In his answer he denies that he was solely responsible.  (Doc. No. 4, ¶ 16).

[13] Briggs's only involvement was after Smith's death.

121).  In addition, Defendants provided the expert report of Thomas D. Fowlkes, M.D., a physician board certified in Emergency Medicine with more than twenty years of practice in Correctional Medicine, who gave the opinion that the policies and procedures that PCRDF had in place regarding inmate access to medical care, responding to medical emergencies, and suicide watch were "reasonable, appropriate, and within the standard of care."  (Doc. No. 42-6).

Plaintiff's effort to meet proof with proof to establish individual liability of Holladay and Briggs consists of referencing the PCRDF's guidelines on suicidal inmates (Doc. No. 42-4). That document ("Pulaski County Sheriff's Office Regional Detention Facility Post Order Number #1") acknowledged the "heightened security measures necessary to ensure the inmate's suicidal intentions cannot be performed" and the need to provide a secure environment for inmates at risk of causing personal injury to themselves.  From there, Plaintiff leaps to the cause of Smith's death—acute pneumonia and dehydration complicating bronchial asthma, with unspecified psychosis as a contributory cause—and the fact that she died while in PCRDF to support her argument that summary judgment should be denied against Defendants Holladay and Briggs.  There is no genuine issue of material fact with respect to the imposition of § 1983 liability on Holladay and Briggs, and their motion for summary judgment on this issue is granted.

The next issue presented for summary judgment by the County Defendants is the deliberate indifference claims against Briggs, Rose, Routh, Sims, Knudsen, Church, and Clark in their individual capacities.[14]  The Eighth Amendment requires state prison officials to provide inmates with needed medical care. *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (citation omitted).  To prove the constitutional violation of deliberate indifference to a medical

---

[14] The County Defendants do not discuss the roles of Deputies Church and Clark in the body of their brief (Doc. No. 43, p. 15-18), but the motion was filed on their behalf and their roles are reflected in the statement of facts (Doc. No. 42, ¶¶ 15, 22).

need, a plaintiff must establish that (1) the plaintiff suffered from objectively serious medical

needs, and (2) the defendants actually knew of, but deliberately disregarded, those needs."

*Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016).

An objectively serious medical need is one that is "either obvious to the layperson or

supported by medical evidence, like a physician's diagnosis." *Roberts v. Kopel*, 917 F.3d 1039,

1042 (8th Cir. 2019) (quoting *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999)).  The

records of Smith's time at PCRDF make it difficult in hindsight to say that Smith—who was

found dead in her cell after several days of not eating or drinking, who had been reported to be

weak and unable to sit up by herself, who had labored breathing, whose blood pressure was

recorded as low as 82/56, who was incoherent and nonsensical, and who had been found in

severe need of IV fluids several times—did not at any point suffer from an objectively serious

medical need.  However, as against the individual PCRDF defendants, "[i]t is well-established

that, "[i]f trained health care officials could not find a serious medical need in these

circumstances, then we decline to hold that a reasonable lay person should have done so."

*Roberts v. Kopel*, 917 F.3d 1039, 1043 (8th Cir. 2019) (citing *Aswegan v. Henry*, 49 F.3d 461,

465 (8th Cir. 1995)).  Defendants have shown that in each instance in which Rose, Routh, Sims,

Knudsen, Church, and Clark interacted with Smith, medical personnel were also present and

assessed Smith and cleared her to remain in her cell. There is no evidence that Briggs had any

knowledge of Smith or her condition until after her death.

Even if a serious medical need could be shown under these facts, there is no evidence that

these defendants deliberately disregarded those needs.  The PCRDF officers repeatedly called

medical personnel to assist and to assess Smith's condition.  Plaintiff fails to offer any evidence

to contradict that offered by the County Defendants.  She likewise fails to address the actions of

the individual defendants.  In her response to the County Defendant's statement of facts, Plaintiff repeatedly states that "the PSCO employees should do more" than have logs, programs, charts, and services that they do not "use or implement" when inmates such as Smith are at risk.  (Doc. No. 48, pp. 20-21).  However, it is Plaintiff's burden, when faced with a motion for summary judgment and supporting evidence, to put forth evidence that a genuine issue of material fact exists. Plaintiff has failed to do so on her claim of deliberate indifference against the individual County Defendants.

In the absence of proof of a constitutional violation, these Defendants are entitled to qualified immunity from liability on the deliberate indifference claim.  Qualified immunity is a question of law appropriately resolved on summary judgment.  *McClendon v. Story Cty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005). Defendants are entitled to qualified immunity if: (1) the facts do not establish a constitutional violation or (2) the constitutional right was not clearly established at the time of the alleged violation.  *Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016).  In the absence of proof of the first prong, Defendants Briggs, Rose, Routh, Sims, Knudsen, Church, and Clark are entitled to qualified immunity on the deliberate indifference claims against them.

Finally, the County Defendants move for summary judgment on the official capacity claims against them.  While Plaintiff has named the individual county employees in their official capacities, it must be treated as suit against Pulaski County. *Brewington v. Keener*, 902 F.3d 796, 800 (8th Cir. 2018).  "A claim against a county is sustainable only where a constitutional violation has been committed pursuant to an official custom, policy, or practice" that was the "moving force" behind the violation, and which custom, policy, or practice was "itself unconstitutional."  *Luckert v. Dodge Cty.*, 684 F.3d 808, 820 (8th Cir. 2012) (citations omitted).

First, as discussed above, Pulaski County asserts that no constitutional violation occurred as the County Defendants were not deliberately indifferent to Smith's medical needs.[15]  The Court agrees.  Lacking proof of a violation, Plaintiff cannot establish this claim.  Pulaski County goes on to argue that Plaintiff has failed to allege that any policy, custom or practice of Pulaski County was a moving force behind the alleged violations of Smith's constitutional rights. Without having any specific custom, policy, or practice to defend, Pulaski County nonetheless sets forth the many policies it has in place to protect inmate health and safety and the specific ways in which those polices were put into practice during Smith's incarceration. (Doc. No. 43, pp. 21-23).  The burden then shifts to Plaintiff to present a genuine issue of material fact in dispute on this issue.

In her response, Plaintiff broadly states that "the record in this case is full of written, policies, customs, and practices that led to the violation of Trillus Smith's constitutional rights." (Doc. No. 47, ¶ 7).  The Court does not accept this invitation to mine the record for nuggets.  *See Rodgers v. City of Des Moines,* 435 F.3d 904, 908 (8th Cir.2006).  In her response to the County Defendants' statement of facts, Plaintiff suggests that the policies, customs, and practices that were in place were not utilized in Smith's case.  She repeats that while there are policies regarding inmate health, "the PCSO should do more" than just have programs, services, and policies that were not implemented in Smith's case.  (Doc. No. 48, pp. 19-21).

In *Luckert*, a jury found Dodge County liable on a claim of deliberate indifference in the case where an inmate committed suicide while detained at the county jail.  The district court

---

[15] The County Defendants also present argument and evidence that, to the extent that Plaintiff intended to state a claim for excessive force, that claim would also fail. The Court finds that no such claim was made and that had it been made, it would not have survived under these facts.

denied the county's motion for judgment as a matter of law.  On appeal, the inmate's personal

representative argued that the county's failure to treat inmates who have been identified as

mentally ill, failure to supervise staff, and falsification of the inmate's records supported the

jury's verdict.  The Eighth Circuit reversed, finding that none of the alleged deficiencies

established that the county had a custom, policy, or practice of violating the inmate's

constitutional rights and causing his death.  684 F.3d at 820.  The Court finds that here, too,

Plaintiff "has not demonstrated the 'continuing, widespread, persistent pattern of constitutional

misconduct' necessary to find the county liable."  *Id.* (citations omitted).  In the absence of proof

of deliberate indifference and an established unconstitutional custom, policy, or practice, Pulaski

County is entitled to summary judgment on the claims against it.

Plaintiff does not distinguish which claims she is asserting against the respective

defendants.  To the extent that she attempted to state a claim for medical negligence against the

County employees for acting "in concert" with the medical providers, the County Defendant's

motion for summary judgment on a medical malpractice claim is granted.

<u>Turn Key's Motion for Summary Judgment</u>

Turn Key moves for summary judgment on both the § 1983 claims against it and the

claims for medical malpractice.  In her response, Plaintiff states that she wants "additional time

for the counsels for all parties concerned to obtain any and all information that could be placed

before this Court and/or a jury to allow justice to prevail."  Plaintiff did file a motion to extend

the discovery deadline that was denied by the Court. (Doc. Nos. 27, 35).  In that motion, filed on

May 3, 2019, Plaintiff stated that "there may be some discovery that needs to be completed by all

the parties" prior to the discovery cutoff date of May 4, 2019, and it is cleat that counsel was

relying on the continuing professional courtesy of opposing counsel to allow discovery past the

deadline.  However, Plaintiff did not identify any discovery that she needed to conduct at that

time, the eve of discovery cutoff.  Nor, in responding to the present motion for summary

judgment, did she follow the procedure provided in Rule 56(d) of the Federal Rules of Civil

Procedure by showing by "affidavit or declaration that, for specified reasons, [the nonmovant]

cannot present facts essential to justify its opposition" to request more time to get the essential

facts.  Instead, Plaintiff have incorporated Exhibit A-1 (Doc. No. 42-2) submitted by the County

Defendants in support of their motion for summary judgment. The Court will consider the

motion on the evidence submitted.

     As to the §1983 claim, Turn Key argues correctly that it cannot be held liable for its

employees under the theory of respondeat superior. "[A] corporation acting under color of state

law will only be held liable under § 1983 for its own unconstitutional policies." *Sanders v. Sears,

Roebuck & Co.*, 984 F.2d 972, 975–76 (8th Cir. 1993) (citing *Monell v. Department of Social

Servs.,* 436 U.S. 658, 690 (1978)).  Therefore, to prevail on her § 1983 claim, Plaintiff must

establish a Turn Key "policy, custom or action by those who represent official policy that inflicts

injury actionable under § 1983." *Id.* at 976.

     Plaintiff responds to Turn Key's motion with arguments directed at Turn Key *and* the

County Defendants, referencing only the policies and procedures of the PCSO.  She does argue

that "[t]here are directives which provide for the medical team and Pulaski County Sheriff's

Department's employees to take special care because of the needs of individuals with mental

issues" and then references Smith's encounters with PCSO deputies and the fact that Smith was

left on the floor "etc., etc."  (Doc. No. 7, p. 12).  She fails to identify a Turn Key policy, custom,

or official action that establishes a "widespread, persistent pattern of constitutional misconduct."

*Luckert*, at 820. Turn Key is, therefore, entitled to summary judgment on the § 1983 claims

against it.

Turning to the medical malpractice claim against Turn Key, the Arkansas Medical Malpractice Act, Ark. Code Ann. § 16-114-206 (a), establishes the elements of proof for a medical injury:

> (a) In any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, the plaintiff shall have the burden of proving:
>
> (1) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;
>
> (2) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant that the medical care provider failed to act in accordance with that standard; and
>
> (3) By means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred.

In is undisputed that Plaintiff does not have an expert to provide the requisite testimony establishing the standard of care or that a medical provider failed to act in accordance with that standard.    The only way Plaintiff can proceed with a negligence claim without an expert is if the negligence she complains of is within the common knowledge of a lay person. See *Haas v. Starnes*, 323 Ark. 263, 268-69 (1996) (common knowledge exception applies to obvious cases of negligence such as "a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it").  A lay person could not be expected to know what acts of negligence could have caused Smith's death by acute pneumonia and dehydration complicating bronchial asthma with an "unspecified psychosis" as a contributing cause. Plaintiff suggest that Turn Key is attempting to avoid liability "in the code words 'standard of care.'"  Whether or not

Turn Key is "well aware of the fact that it did not meet the expectations and requirements of providing medical care" to Smith does not absolve Plaintiff of her burden of proof as established by the Arkansas General Assembly.  Defendant Turn Key's motion for summary judgment on the issue of medical negligence is granted.

Conclusion

The gist of Plaintiff's complaint against all of the defendants is that Smith's death was preventable, and all of the defendants had an opportunity and a responsibility to be the instrument of prevention.  She believes that "the acute pneumonia could have been cured and the dehydration could have been stopped with proper medical care or the transfer of Trillus Smith to a hospital where better care could have been taken of Trillus Smith." (Doc. No. 48, ¶ 70). She believes that the unspecified psychosis "apparently made Trillus Smith unable to voluntarily or without aid drink the water" leading to her death.  (doc. No. 48, ¶ 93).   The Court understands Plaintiff's position and is sympathetic to her tragic loss.  However, in every case a plaintiff is required to prove each of the elements of the claims she presents against each defendant before that defendant can be found liable.  It is not enough to say that something horrible happened over the course of days that could have been prevented by the different people and entities involved. Plaintiff argues that the "proof to 'chin the bar' in this case is readily apparent to those who want to see justice done even though the poor and people of color suffer from unfair rules imposed by powers greater than them."  (Doc. No. 45, p. 2).  The Court wants to see justice for Trillus Smith and has worked hard to analyze the pending motions for summary judgment in a light most favorable to Plaintiff as the nonmoving party.  However, Plaintiff's passion does not take the place of the requisite proof; the evidence needed to defeat the motions is not in the record.

For the reasons stated above, the Nurse Defendants' motion to dismiss (Doc. No. 36) is

GRANTED; the County Defendants' motion for summary judgment (Doc. No. 41) is

GRANTED; and Turn Key's motion for summary judgment (Doc. No. 38) is GRANTED.  A

separate judgment will be entered.

IT IS SO ORDERED this 23rd day of July, 2020.

_____
James M. Moody
United States District Judge